**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

EUGENE DEMICK

        Plaintiff,

v.                                            Case No. 09-CV-10480

AMY BRETES,

        Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CONVERTING
HEARING INTO A STATUS CONFERENCE**

      Early in the evening on August 23, 2008, Plaintiff Eugene Demick and his wife, Sally, were driving northbound on US-127 when, as he would later explain, a piece of plastic trim dislodged from the back of his pick-up truck. Plaintiff stopped his truck on the side of the highway, and got out to look for the piece. While waiting for her husband in the truck, Mrs. Demick decided to open a can of beer. At about that time, Defendant Amy Bretes, a deputy of the Jackson County Sheriff's Department with about 18 months' experience, noticed the Demick vehicle and stopped her patrol car to investigate or provide aid. The subsequent interaction between the Demicks, Deputy Bretes and Volunteer Reserve Deputy Paul Anderson forms the basis of this lawsuit under 42 U.S.C. § 1983.

      Currently before the court is Defendant's "Motion for Summary Judgment and Brief in Support." The matter has been fully briefed and the court concludes a hearing

is unnecessary.  *See* E.D. Mich. LR 7.1(e)(2).   For the reasons stated below, the court will grant in part and deny in part Defendant's Motion.

## I.  BACKGROUND[1]

At the time of this incident, Amy Bretes was employed as a Road Patrol Deputy for the Jackson County Sheriff's Department and had been employed in this capacity since January, 2007.  (Undisputed Fact # 1.)  Defendant began working for the Sheriff's Department as a 911 Dispatcher in March, 2004.  (*Id.* # 2.)  In 2006, she attended Kalamazoo Valley's Police Academy, and was thereafter hired as a Road Patrol Deputy.  (*Id.* # 3.)  She worked as a Volunteer Reserve for the Sheriff's Department, from 2002 to 2003.  (*Id.* # 4.)  In addition to attending Kalamazoo Valley's Police Academy, she also went through Kellogg's Academy Training, and has a degree from Kellogg.  (*Id.* # 5.)  At Kalamazoo Valley, she received training with respect to chemical spray irritants; the training included being sprayed with the compound.  (*Id.* # 6.)  She has been trained, based on a "use of force continuum," that it is appropriate to use pepper spray when an officer's actions are met with active resistance.  (*Id.* # 7.)  Before the incident at issue here, she had used her pepper spray on one other occasion.  (*Id.* # 8.)

---

[1]Unless otherwise noted, the following facts were proffered by Defendant and materially undisputed by Plaintiff.  Some of the facts proffered by Defendant were admitted by Plaintiff, but with a notation that the fact occurred at a different time than intimated by Defendant.  Due to the circumstances of this case, the timing of certain events is important in determining the escalation of the interaction between Plaintiff and Defendant.  Where the parties disputed the timing of any events, the court must accept Plaintiff's version–so long as it is adequately supported by a factual citation.  In reviewing the facts, however, the court found that when the timing of an event was at all disputed, Plaintiff's version was ultimately supported, not only by testimony, but also by the video record of the incident.

On the date of incident, Bretes encountered the Demicks' truck at about 7:30 p.m., which was midway through her shift. (*Id.* # 9.) Volunteer Reserve Deputy Paul Anderson was accompanying her in the vehicle. (*Id.* # 10.) Bretes's attention was initially drawn to the Demick vehicle because it was on the shoulder of the road. (*Id.* # 11.)

Plaintiff and his wife had been on their way to dinner on US-127, but stopped to look for a piece of Plaintiff's truck which had fallen off. (*Id.* # 12.) Defendant pulled up behind the vehicle to render aid or to determine whether the vehicle had been abandoned – in one way or another she was investigating why it was there. (*Id.* # 13.) When she stopped her patrol vehicle behind their truck, she saw Plaintiff walking in the median of the highway. (*Id.* # 14.)

Before leaving their home, about two and a half hours prior to the incident, both Mr. and Mrs. Demick consumed a rum cocktail. (*Id.* # 15.) Mrs. Demick took a beer with her in the vehicle. (*Id.*)

Mr. and Mrs. Demick had been walking alongside the freeway and when Deputy Bretes began talking to Plaintiff, he came across the traffic lane toward her. (*Id.* # 16.) She asked him what he was doing, why he was out of his vehicle, and asked him to provide identification. (*Id.* # 17.) She advised him that it is not safe to be on the highway, as a pedestrian. (*Id.* # 18.)

At Bretes' request, Plaintiff retrieved his driver's license from the truck. (*Id.* # 19.) After she was handed Plaintiff's I.D., she started to the patrol vehicle to enter the information, but on her way back she received information from Deputy Anderson who advised her that from the passenger side of the vehicle he had seen an open container

of beer in the center console.  (*Id.* # 20.)  Defendant went to the passenger side and also observed the beer can.  (*Id.* # 21.)

At that point, Defendant recognized that a violation of law had been committed.  (*Id.* # 22.)  Plaintiff stated that the can was not his;  Mrs. Demick, who had by that time returned to the vehicle, stated that it was hers.  (*Id.* # 23.)  Mrs. Demick was then asked to remain outside with Deputy Anderson (near the side of the patrol car) while Defendant continued her investigation by verifying information from inside her patrol car.  (*Id.* # 24.)

Returning to the front of the patrol car, Defendant told Plaintiff to return to his truck.  (*Id.* # 25.)  Defendant asserts that this was to inhibit Plaintiff from interfering with her investigation, and so she could maintain control of the situation;  no verbal explanation appears on the video record of the incident.  (Def.'s Fact # 25.)   Plaintiff did not, however, return to his vehicle, but instead stood his ground, stating "I'm not leaving my wife." (Undisputed Fact # 26.)  He was asked again by Defendant to return to his vehicle but indicated that he was refusing to comply (verbally and by the non-verbal act of crossing his arms in front of him (*Id.* # 27)), and disputed whether he and his wife had done anything wrong by having open intoxicants in the vehicle.  (*Id.* # 28.)

Defendant then warned Plaintiff to step into his vehicle or he would "go with" her.
***QUOTE EXACTLY HERE AND CITE THE AUDIO RECORDING***
(*Id.* # 29.)  Mrs. Demick testified that Defendant wanted Plaintiff to return to his vehicle and that Mrs. Demick told him she was okay.  (*Id.* # 30, Sally Demick Dep. at 27, 42, Defs.' Ex. 3.)   Plaintiff then took his wife by the arm and attempted to usher her back to the car, stating, "I'm taking her with me." (*Id.* # 31-32.)

4

Deputy Anderson saw Plaintiff take Mrs. Demick's arm and said, referring to Mrs. Demick, "she's staying out here." (*Id.* # 32.)[2] Nearly simultaneously, Defendant attempted, without much apparent effect, to take hold of Plaintiff's wrist. (*See* DVD, Defs.' Ex. 2;  Pl.'s Dep. at 25.)  Defendant can be heard saying at this time, "sir, do not . . . resist me," although on the recording there appears little, if any, physical resistence being offered by Plaintiff at the time. (*See* DVD, Defs.' Ex. 2.)  Defendant testified that Plaintiff "pulled away from me two times" (see Def's Dep. at 24).  Defendant testified that she "had already warned [Plaintiff] that he would be arrested if he didn't comply with [her] direction the first two or three times." (See Def.'s Dep. at 29).  Plaintiff testified that he neither heard Defendant give any warning of arrest nor recall her "grabbing onto [his] hand." (Pl.'s Dep. at 16.)

Plaintiff can be seen then retreating from the area of the discussion, turning his back on the deputies and walking toward the driver's side of his truck.  Defendant and Anderson, however, closely followed him, leaving Mrs. Demick alone, standing behind the truck.  (*Id.*)  As Plaintiff started to get into his truck and sit down, Defendant, offering no further comment (and issuing no warning, which Defendant testified is consistent with use-of-force protocols, (*see* Def.'s Dep. at 31)), reached in front of Plaintiff with her left hand and discharged pepper spray from what appeared to be several inches in front of Plaintiff's face for approximately two seconds.  This apparently stunned Plaintiff as

---

[2]Based on the language used by Defendant in her brief, there is some confusion as to whether the parties are in agreement as to the order of these two statements.  The court has adopted the order which appears in the DVD itself.  Any dispute, however, is not material.

5

Defendant said she intended. (*Id.*) Defendant then walked Plaintiff from the truck to the patrol car and took him into custody. (*Id.*; Undisputed Fact # 37.)

Plaintiff was told at the time that he was being charged with being "Disorderly," but after Defendant spoke with her Sergeant, the charge was upgraded to a felony offense, "Assaulting/Resisting/Obstructing." (Undisputed Fact. # 38.) At no time did either of the Demicks make Defendant aware of any alleged hearing problem suffered by Plaintiff, and no such difficulty ever became obvious to her in the course of their interaction. (*Id.* # 39.) Plaintiff had never worn a hearing aid prior to the incident, but did begin wearing one after the incident. (*Id.* # 40.)

After Plaintiff was taken into custody, Defendant completed her investigation, ran the Demicks' information through the in-car computer, gave Mrs. Demick Preliminary Breath Tests (PBT), and subsequently allowed Mrs. Demick to drive the truck away from the scene. (*Id.* # 41.) Mrs. Demick was issued a citation for being in possession for the open can of beer.[3]

Plaintiff was released that night, approximately two hours after he arrived at the jail. (*Id.* # 42.) Plaintiff admits that upon arrival at the police station, approximately

---

[3] Although Defendant testified at her deposition that she did not "know what the statute says" in terms of the potential liability of a driver under these circumstances, (*see* Def.'s Dep at 20), Michigan law prohibits both "possessing" and "transporting" uncapped alcohol in a vehicle on a highway (*see* Mich. Comp. Laws § 257.624(a)). It appears clear that a driver, a passenger or both could be criminally charged. It is not entirely clear, however, whether Defendant originally intended to issue the citation to Mrs. Demick or to Plaintiff, because at one point in the recording Defendant can be heard telling Mrs. Demick that even though she –Mrs. Demick– claimed possession of the beer, "he," clearly referring to Plaintiff, "is in going to be in trouble" for the open alcohol.

20-30 minutes after he was handcuffed, he was given decontamination wipes to apply to his face.  (*Id.* # 43.)

After the fact, Plaintiff stated that he did not hear Defendant tell him he was under arrest or that he should not resist her and was confused as to whether to go into the truck or stay.  (Pl.'s Dep. at 23-24, Def.'s Ex. 4.)  He testified that if he had heard her state "do not resist me or you're under arrest," he would have complied.  (*Id.*)[4]

The charges against Plaintiff were ultimately dismissed by the prosecutor.  (Undisputed Fact. # 46.)

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

---

[4] As noted, *infra*, it seems to the court from its review of the video and audio record that there was no use of the word "arrest" at all.  If the court is correct in this perception, Plaintiff's professed failure to hear the word uttered is entirely reasonable.

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party must first show the absence of a genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). They must put forth enough evidence to show that there exists a genuine issue to be decided at trial. *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment – the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (alteration in original) (citation omitted)). A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

## III.  DISCUSSION

Plaintiff initiated this action on February 9, 2009, asserting four counts against Defendant Bretes.  On March 27, 2009, the court issued an order dismissed Plaintiff's three state law counts, leaving only Count I, which was brought under 42 U.S.C. § 1983 and asserts various violations under Fourth Amendment.  Defendant now seeks summary judgment on Plaintiff's allegations that his arrest and prosecution were without probable cause and that Defendant utilized excessive force in effectuating the arrest.  Defendant also asserts that she is entitled to qualified immunity.

To prevail on a claim brought under 42 U.S.C. § 1983, Plaintiff must prove that Defendant acted "under color of law" and that her conduct deprived Plaintiff of a clearly established right, privilege, or immunity secured by the Constitution or the laws of the United States.  42 U.S.C. § 1983; *Markva v. Haveman*, 317 F.3d 547, 552 (6th Cir. 2003); *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003)*; Ahlers v. Schebil,* 188 F.3d 365, 370 (6th Cir. 1999).  The parties do not dispute that Defendant was acting under color of law and the court's focus is therefore on whether Plaintiff can establish a violation of her clearly established constitutional rights.

### A.  Probable Cause

"A person who has been the victim of an unlawful arrest or wrongful seizure under the color of law has a claim based on the Fourth Amendment guarantee that government officials may not subject citizens to searches or seizures without proper authorization."  *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009) (citing U.S. Const. amend. IV; Gardenhire v. Schubert, 205 F.3d 303, 312-13 (6th Cir. 2000)).  The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV.  It is well-established that the Fourth Amendment requires probable cause for an arrest or seizure of a free citizen, such as Plaintiff.  *See Michigan v. DeFillippo*, 443 U.S. 31, 36-37 (1979); *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003).  Thus, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

"'[P]robable cause' to justify an arrest means facts and circumstances . . . that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo*, 443 U.S. at 37.  "The probable cause determination is essentially the same under Michigan law." *Hinchman v. Moore*, 312 F.3d 198, 206 (6th Cir. 2002).  "Probable cause to arrest exists where the facts and circumstances . . . are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *People v. Champion*, 549 N.W.2d 849, 860 (Mich. 1996).

Here, the court finds as a matter of law that the materially undisputed facts, as proffered by Defendant and accepted by Plaintiff, and as primarily displayed on the DVD recording of the incident, support a finding of probable cause.  Under Michigan Law, "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a

10

person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both." Mich. Comp. Laws § 750.81d. Under the statute, "'[o]bstruct' includes the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." Mich. Comp. Laws § 750.81d. The Sixth Circuit has recently held that "a straightforward reading of the language of § 750.81d(7)(a) provides that the law can be violated in two ways: by physically resisting a command, whether lawful or unlawful, or by refusing to comply with a lawful command without using force." *Brooks*, 577 F.3d at 707.

Here, there is no dispute that Defendant was in the process of performing her duties with respect to investigating and issuing a violation for possession of an open can of beer when she issued Plaintiff a command to return to his vehicle. Plaintiff undisputedly refused to comply. Plaintiff does not appear to argue that Defendant's command was unlawful. Indeed, an officer may detain a vehicle and its occupants for the length of time necessary to complete a traffic stop. *See generally United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008). The Supreme Court has held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson,* 519 U.S. 408, 415 (1997). The Third Circuit has extrapolated from *Wilson* to hold that officers may likewise order passengers to remain in the car with his hands in the air. *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997). Here, there can be no legitimate argument that Defendant issued Plaintiff a lawful command when she ordered Plaintiff to return to his vehicle while she completed the investigation relevant to his wife.

11

Nor can there be any dispute that Plaintiff failed to comply with this command. While Plaintiff argues that he was concerned for his wife's safety, this excuse, while perhaps understandable, is not relevant to the question of whether Plaintiff himself refused to comply with Defendant's lawful command to return to his vehicle. Nor is it material that Plaintiff eventually *attempted* to comply with Defendant's command. The court entirely agrees that Defendant's later commands were "hardly a model of clarity," (Pl.'s Resp. at 6), but the *initial* command to return to the vehicle was sufficiently clear as was Plaintiff's initial refusal to return to comply. At the point that Plaintiff indicated a refusal to return to his vehicle, Defendant had probable cause to believe that Plaintiff had violated Mich. Comp. Laws § 750.81d. One may readily disagree with the prudence of a decision to make a custodial arrest at that moment, based upon the demonstrated degree of non-compliance and with no further attempt to explain the need for Plaintiff to remove himself from the scene of a discussion of a very minor violation of the law by his passenger. The court's task is not, however, to evaluate a law enforcement officer's prudence, judgment or degree of perceived professionalism. The court asks only whether sufficient cause existed to arrest Plaintiff under § 750.81d. The answer to that question is yes. Plaintiff's claim under the Fourth Amendment fails as a matter of law.

Similarly, Plaintiff's malicious prosecution claim fails because of the existence of probable cause. Plaintiff contends that Defendant supplied false facts in her police report and the prosecutor relied upon the police report. "Falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional." *Hinchman*, 312 F.3d at 206. Thus, "[t]his Circuit has held that

12

alleging prosecution based upon an officer's having 'fabricated evidence and manufactured probable cause' is sufficient to state a claim of malicious prosecution under the Fourth Amendment." *See McGuire v. City of Royal Oak*, 295 F. App'x 736, 739 (6th Cir. 2008) (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir.1999); *Adams v. Metiva*, 31 F.3d 375, 388-89 (6th Cir. 1994)). "[O]nly if a false statement was made knowingly and intentionally, or with reckless disregard for the truth and if, with the [officer's] false material set to one side, the [defendant's conduct] is insufficient to establish probable cause, is there a constitutional violation under the Fourth Amendment." *Hinchman*, 312 F.3d at 206 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (internal quotation marks and alterations omitted)).

Plaintiff argues that Defendant's report does not indicate that Plaintiff was acting out of concern for his wife's safety, that he was "simply having a peaceful discussion with Defendant," and that, at the time Defendant pepper-sprayed him, he was returning to his vehicle. (Pl.'s Resp. at 7.) However, had Defendant's report include all of these additional facts, probable cause would nonetheless still exist to prosecute Plaintiff for a violation of Mich. Comp. Laws § 750.81d.[5] Plaintiff's concern for his wife, his eventual compliance with Defendant's command, and even the "peaceful" way in which he originally "discussed" the situation with Defendant may have, as Plaintiff suggests, influenced the determination at the prosecutorial discretion stage, but as a matter of Fourth Amendment law, it does not negate the fact that probable cause existed based

---

[5]The court also notes that the failure to include all of these additional facts does not necessarily make Plaintiff's report "false" sufficient to give rise to a malicious prosecution claim.

13

on Plaintiff's initial refusal to comply with Defendant's lawful command. Because probable cause existed as a matter of law to proceed against Plaintiff, his claims must fail. *See Hinchman*, 312 F.3d at 206; *see also Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001) ("[I]f this court finds that there was probable cause to prosecute [the plaintiff], regardless of any alleged false statements made by [the officer], then she cannot make out a malicious prosecution claim under the Fourth Amendment."); *see also Garner v. Grant*, 328 F. App'x 325, 327 (6th Cir. 2009) ("The existence of probable cause, therefore, negates an essential element of a § 1983 suit alleging 'deprivation of constitutional rights under color of law.'") (quoting *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 357 (6th Cir. 1997)).

Summary judgment is therefore properly granted to Defendant on Plaintiff's Fourth Amendment claim for malicious prosecution and arrest without probable cause.

### B. Excessive Force

The sole constitutional standard for evaluating claims of excessive force during the course of an arrest is the reasonableness criterion of the Fourth Amendment. *Graham*, 490 U.S. at 395; *Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004). Determining whether the force used to make a particular seizure is reasonable under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." *Graham*, 490 U.S. at 396. "Courts must apply an objective standard, looking to 'the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or

14

attempting to evade arrest by flight.'" *Gaddis*, 364 F.3d at 772 (quoting *Graham*, 490 U.S. at 396). Evidence related to the severity of a plaintiff's injuries may also be relevant in determining the amount of force used. *Martin v. Heideman*, 106 F.3d 1308, 1311-12 (6th Cir. 1997) (finding that the Supreme Court's reference to the "nature and quality of the intrusion" in *Graham* must include consideration of the severity of any injury inflicted).

Courts assess the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, not *ex post* with the benefit of 20/20 hindsight. *Graham*, 490 U.S. at 396. The court's reasonableness calculus allows "for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* at 397. Thus, "there is no easy-to-apply legal test in the Fourth Amendment context, and instead judges are to look to the factual and practical considerations of everyday life which reasonable and prudent men, not legal technicians, act." *Davenport v. Causey*, 521 F.3d 544, 551-52 (6th Cir. 2008) (internal quotations and citations omitted). The right to make a lawful seizure "carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Id.* Totally gratuitous uses of force, however, may be excessive. *Gaddis,* 364 F.3d at 772 (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). In addition, the subjective intentions of the officers involved are not relevant to whether the force used was reasonable. *Graham*, 490 U.S. at 397.

At this summary judgment stage, this court should "determine the relevant set of facts and draw[ ] all inferences in favor of the nonmoving party to the extent supportable by the record." *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (*quoting Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1776 n.8 (2008)).  The conclusion whether Defendant's' actions could be judged reasonable under the Fourth Amendment is purely a question of law.  *Id.* at 353.

The facts in this case, viewed in a light most favorable to Plaintiff and directly supported by the DVD recording of the incident, readily support Plaintiff's claim for excessive force.  The court is keenly aware that, in viewing the DVD and drawing reasonable inferences in Plaintiff's favor, the court must nonetheless view the scene from the objective standard of a reasonable officer on the scene, without the benefit of 20/20 hindsight.  *Graham*, 490 U.S. at 396.  The court also recognizes that "police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation."  *Id.* at 397.

Here, however, after viewing the DVD recording several times, the court concludes that Defendant's use of force in the form of pepper spray could easily be interpreted as unreasonable.  Plaintiff did initially refuse to return to his vehicle, and Defendant did warn Plaintiff that, at some point, if he did not return to the vehicle he would have to "go with" her, although the court cannot discern in the audio record any of the verbal warnings of "arrest" Defendant claims in her testimony she gave.

The court realizes that there is no preordained set of magic words required to notify a person that he is being arrested.  *Centanni v. Eight Unknown Officers*, 15 F.3d

16

587, 590 (6th Cir.1994) ("a clear deprivation of liberty caused by law enforcement officers without formal words is nonetheless an arrest.") (internal quotations marks and alterations omitted). Nonetheless, from the court's review of the evidence the Defendant simply did *not* instruct Plaintiff that her "go with" warning had come to fruition and that he must "go with" her now to her patrol car; she did *not* appear to tell him that she was placing him under "arrest" or taking into "custody"; she did *not* order or tell him to submit to handcuffing; she did *not* tell him that he was no longer required or allowed to return to his truck. At a minimum, a reasonable jury could so determine.

Instead, she simply attempted to grab him, and as far as the court can determine her handcuffs were not brought out or deployed. The video could readily be interpreted by an objective juror as supporting the proposition that Plaintiff was, at the least, not fully aware of Plaintiff's effort to take hold of him before he said, "I'll get in my truck."[6] A reasonable interpretation of the evidence as a whole is that Plaintiff was left to determine on his own whether the deputy was grabbing him in order to physically escort him away from where his wife was standing and toward his vehicle, or to arrest and take him into custody. The closest Defendant came to informing Plaintiff of her intentions was her statement "sir, do not resist me." Even though Plaintiff testified that he did not hear her say this, even if he had it would not necessarily be clear to an objective motorist on the scene whether the deputy was telling him to "not resist" her attempt to

---

[6] From the video, Defendant's attempts to physically restrain Plaintiff seemed to be almost entirely ineffectual. Plaintiff, at 6'2" and 240 pounds, was eight inches taller than the 5'6" Defendant, and at least 55 pounds heavier. (*See* Pl.'s Dep. at 23; Def.'s Dep. at 5.) He appeared to take little notice of whatever effort Defendant was making to grab or hold him.

17

handcuff him, or to "not resist" her order to return to his vehicle.

Based on the video evidence, it is clear to the court that a conclusion can be drawn that Plaintiff believed Defendant was trying to escort him to the vehicle. Once she reached out to take hold of him, he immediately began walking back to his vehicle, and loudly informed the deputy that he was in fact walking back to his vehicle–as she had specifically ordered mere seconds earlier. Defendant uttered no words indicating that she no longer wanted him to go back to the vehicle; she simply followed in his footsteps and discharged pepper spray into his face.

Based on these facts, which are evident on the DVD and therefore undisputed,[7] a jury can readily conclude that a reasonable officer on the scene would not have used this degree of force on an individual who obviously did not understand the evolving and unarticulated desires of an officer.

Contrary to Defendant's intimations, this is not a situation where Defendant could reasonably have believed that Plaintiff, having just expressed his firm desire to remain with his wife, was going to attempt to flee. It is also not a situation, as in *Dunn*, where Plaintiff could have reasonably believed that in returning to his vehicle, where Defendant had just moments before instructed him to go, Plaintiff would pose any danger to Defendant. Instead, it may well be that Defendant harbored an unreasonable assumption that she had sufficiently verbalized her internal thought that it was time to

---

[7] *See Dunn,* 549 F.3d at 350 ("Because the arrest and preceding events were recorded by a camera affixed to Officer Matatall's police car, the underlying facts of the case are undisputed.").

take Plaintiff into custody and that Plaintiff was resisting her, and that it was this assumption that led to an unreasonable use of force. In sum, the severity of the crime at issue –standing too near the deputy who wanted to talk to Plaintiff's wife, and refusing to move away– was insignificant under the circumstances; Plaintiff posed no apparent threat to the safety of the officers or others; Plaintiff was not particularly active, if he was active at all, in resisting arrest; Plaintiff was not attempting to evade arrest by flight. *See Gaddis*, 364 F.3d at 772 (quoting *Graham*, 490 U.S. at 396).

Defendant testified that she was presented with "an escalated situation." (*See* Def.'s Dep. at 29.) The court frankly agrees that the situation escalated, and that it did so fairly rapidly. To the extent that a jury seeing the video of the encounter would agree, however, they could easily conclude that it was Defendant who was principally responsible for the escalation.

On the other hand, there is no evidence to show that the use of force was vindictive. Indeed, Defendant likely believed at the time that Plaintiff was actively resisting her arrest. The problem, however, is that it is not Defendant's subjective beliefs that are relevant, but the objective reasonableness of her actions. As the Supreme Court has held, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; *nor will an officer's good intentions make an objectively unreasonable use of force constitutional.*" *Graham*, 490 U.S. at 397 (emphasis added). Defendant's likely good intentions in this case do not align with the reasonableness of the objectively viewed situation.

Accordingly, Defendant's summary judgment motion will be denied as to

Plaintiff's claims of excessive force under the Fourth Amendment.[8]

## IV.  CONCLUSION

IT IS ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 16] is GRANTED.

IT IS FURTHER ORDERED that the December 2, 2009 hearing is CONVERTED into a status conference.

     S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  December 1, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 1, 2009, by electronic and/or ordinary mail.

     S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

---

[8] Simiarly, the court must reject Defendant's argument that she is entitled to qualified immunity.  Qualified immunity "involves a two-fold inquiry: First, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . [T]he next, sequential step is to ask whether the right was clearly established.'" *Barber v. Overton*, 496 F.3d 449, 453 (6th Cir. 2007) (quoting *Saucier v. Katz*, 553 U.S. 194, 201 (2001)).  The individual asserting the defense bears the burden of demonstrating that "the challenged act was objectively reasonable in light of the law existing at the time." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citing *Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004)).  Here (and limited to the facts of this case), the use of pepper spray on an individual who was retreating to his vehicle as ordered by the officer moments before cannot be said to have been objectively reasonable as a matter of law.  Further, the right be free from an unreasonable use of pepper spray was clearly established at the time of the incident.